UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No. 1:25-cv-20945-RKA

PHILLIP DANIELS, III, individually
and as surviving spouse and
Personal Representative of the Estate
of HEATHER DANIELS, deceased,
and as parent and legal guardian on
behalf of Jada Shelby Daniels, Phillip
Daniels, IV and M.D., a minor,

Plaintiffs,

vs.

NCL (BAHAMAS) LTD., A BERMUDA
COMPANY d/b/a NORWEGIAN CRUISE
LINE.

Defendants.
_____/

**PLAINTIFF'S AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, PHILLIP DANIELS, III, Individually and as Personal Representative of the

Estate of HEATHER DANIELS, and as legal guardian of Jada Shelby Daniels, Phillip

Daniels, IV and M.D., a minor, hereby sues NCL (BAHAMAS), LTD. A BERMUDA

COMPANY d/b/a Norwegian Cruise Line, (hereinafter "NCL") and alleges as follows:

**THE PARTIES**

1.     At all times material, Plaintiff, PHILLIP DANIELS, III, was the husband of

Heather Daniels, deceased.

2.     At all times material, Plaintiff, PHILLIP DANIELS, III, is *sui juris* and a citizen

and resident of the State of New York and he has been appointed as the Personal

Representative of the Estate of Heather Daniels.

3.    Plaintiff, PHILLIP DANIELS, III ("Plaintiff"), as Personal Representative of the Estate of Heather Daniels, brings this action on behalf of the Estate of Heather Daniels, on his behalf as surviving spouse of Heather Daniels, and on behalf their three (3) surviving children:

      A.  Jada Shelby Daniels, born on May 26, 2004.

      B.  Phillip Daniels, IV, born on February 16, 2006.

      C.  M.D., born in 2010

4.    Defendant, NCL (BAHAMAS) LTD., d/b/a NORWEGIAN CRUISE LINE ("NCL"), is a Foreign Profit Corporation, with its principal place of business in Miami-Dade County, Florida.

5.    At all times material, NCL owned, operated, managed, maintained and/or controlled the cruise ship, Norwegian *Getaway*.

## JURISDICTION AND VENUE

6.    At all times material, NCL, in the county and district in which this Amended Complaint is filed:

      a.  Operated, conducted, engaged in or carried on a business venture in this state and/or county; and/or

      b.  Had an office or agency in this state and/or county; and/or

      c.  Engaged in substantial activity within this state; and/or

      d.  Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193.

7.    The Court has jurisdiction over this matter because the causes of action asserted herein arise under 28 U.S.C. § 1333, the General Maritime Laws of the United States and the Death on the High Seas Act ("DOHSA") 46 U.S.C. § 30301-8.

8.      This is an action for damages which exceeds the sum specified in 28. U.S.C. 1332, exclusive of interest and costs.

9.      This Court has subject matter jurisdiction, as there is complete diversity of citizenship pursuant to 28 U.S.C. 1332, as this action is between citizens of a State and/or citizens or subjects of a foreign state.

10.     Venue is proper in this Court because NCL's principal place of business is within Miami-Dade County and a substantial part of the events or omissions giving rise to the causes of action set forth herein occurred within the county. The cruise line ticket at issue also requires that suit be brought in this Court.

11.     All conditions precedent and necessary for the filing and maintenance of this action have been fulfilled, waived or do not apply.

## FACTUAL BACKGROUND

12.     NCL, as a common carrier, is engaged in the business of providing vacation cruises to the public aboard vessels, including the NCL *Getaway*. At all times material hereto, NCL owned, operated, managed, maintained and/or controlled the *Getaway*, including the medical department on the *Getaway*.

13.     NCL, through online, television, radio and/or print advertisements specifically markets its cruises as award-winning and providing incredible experiences, entertainment and the best vacations for travelers.

14.     As part of providing vacation cruises, NCL is obligated to provide competent medical care and facilities, as well as personnel capable of making sound medical and evacuation decisions.

15.     As part of providing vacation cruises, NCL advertised that its ships, including

the *Getaway*, have a state-of-the-art onboard medical center staffed with highly qualified physicians and nurses in order to provide care for guests at sea and that its ships have defibrillators, cardiac monitors, x-ray machines, laboratory equipment and medications onboard. NCL also advertised that its onboard medical team worked closely with its shoreside team, including a Chief Medical Officer.

16. NCL charges money to passengers for the medical services it provides. As such, NCL is in the business of providing medical services to passengers for profit and owes a duty to provide competent and non-negligent medical care and services.

17. NCL owned, operated, controlled and/or maintained the medical center aboard the *Getaway*. NCL maintained a shoreside team to assist with medical issues and medical emergencies involving its guests and its onboard medical center and shoreside team work as a team in the event of a medical evacuation emergency.

18. NCL was at all times material aware that medical emergencies may arise on its vessels, including the *Getaway*, and was aware of the essential need to promptly evacuate passengers suffering from serious medical emergencies.

19. Upon information and belief, NCL partnered with shoreside medical institutions in order to provide medical advice and medical assistance as needed for its guests.

20. NCL, through its shoreside team, had the ability to control and monitor each and every step taken by its medical staff onboard the *Getaway* via telephone, video conference, Skype or otherwise.

21. NCL's officials and employees had the ability to monitor and participate in safety, security and medical emergencies onboard the vessel by communicating with the *Getaway's* crew via telephone, videoconference, Skype and other means of communication.

NCL, through both the crew onboard and their shoreside team and employees, who acted in consultation with one another, failed to properly care for and promptly and properly evacuate Mrs. Daniels.

22.     Upon information and belief, the Master and/or Captain of the *Getaway* was an employee or agent of NCL and had the ability to divert or control the ship or make the appropriate decision to afford one of its passengers the medical care and treatment she desperately needed.  The Master/Captain and his/her bridge team are also responsible with determining the logistics for medical evacuation or disembarkation, properly coordinating with the United States Coast Guard to evacuate sick and injured passengers and ensuring that NCL's passengers are afforded the logistical support needed during a medical emergency. This responsibility is carried out in conjunction with NCL's shoreside operations and the shoreside team from NCL that coordinate voyage logistics.

23.     At all times material, NCL was vicariously liable for the negligence of the medical staff, including the doctors and nurses, onboard the *Getaway* who were employees, apparent agents or actual agents of NCL.

24.     At all times material, NCL was vicariously liable for the negligence of the non-medical personnel onboard the *Getaway* who were employees, apparent agents or actual agents of NCL.

25.     At all times material, NCL had control or the right to control all persons working in its onboard medical centers, including the doctors, nurses and personnel that improperly treated and negligently mismanaged Mrs. Daniels' condition.

26.     Mrs. Daniels and her family relied upon NCL's representations regarding its available shipboard medical facility with its qualified and competent physicians and nurses in

her decision to purchase the cruise ticket and contract with NCL for the subject cruise.

27.     On February 26, 2024, Mrs. Daniels boarded the NCL *Getaway* for a 10-day cruise from New York to Bermuda, followed by Puerto Rico, Dominican Republic and back to New York.  Mrs. Daniels was a paying passenger.

28.     On the early morning hours of March 3, 2024 at approximately 1:12 a.m., the medical center on the *Getaway* received a call from an NCL staff member regarding Mrs. Daniels having been found unconscious on the floor of a hallway in the ship.

29.     NCL medical personnel, Dr. Dinah Suyot, Dr. Van Der Merwe, Nurse Bryan Geronimo, Nurse Lipat and Nurse Corral went to the scene where they found Mrs. Daniels on the floor unresponsive.

30.     At all times material, Dr. Suyot was an employee or agent of NCL as its ship physician and was at all times material acting within the course and scope of her employment or agency with NCL.

31.     At all times material, Dr. Van Der Merwe was an employee or agent of NCL as its ship physician and was at all times material acting within the course and scope of her employment or agency with NCL.

32.     At all times material, Nurse Geronimo was an employee or agent of NCL as one of its ship nurses and was at all times material acting within the course and scope of his employment or agency with NCL.

33.     At all times material, Nurse Lipat was an employee or agent of NCL as one of its ship nurses and was at all times material acting within the course and scope of his employment or agency with NCL.

34.     At all times material, Nurse Corral was an employee or agent of NCL as one

of its ship nurses and was at all times material acting within the course and scope of his employment or agency with NCL.

35.     When Dr. Suyot, Dr. Van Der Merwe, Nurse Geronimo, Nurse Lipat and Nurse Corral arrived at the scene and encountered Mrs. Daniels on the floor, they found that her blood pressure was significantly elevated at 203/109, her pupils were sluggish and her Glasgow Coma Scale score was abnormal at a 4.

36.     Mrs. Daniels was placed on a stretcher and taken to the *Getaway's* medical center where was admitted at 1:24 a.m. under critical care with orders to monitor her vital signs and watch for decreased sensorium.

37.     Dr. Suyot performed a physical examination of Mrs. Daniels at 1:24 a.m. in the ship's medical center.  The physical examination failed to include a complete neurological examination, including but not limited to, a visual examination, cranial nerve examination, NIH stroke scale score and/or the presence of any neck stiffness or rigidity.

38.     The differential diagnoses arrived at by Dr. Suyot were a cerebellar stroke syndrome, infarct vs. hemorrhage, syncope and collapse, cardiac arrhythmia, headache and seizure.

39.     At 1:30 a.m., Nurse Geronimo found that Mrs. Daniels was responding to voice but her speech was incomprehensible.

40.     At 2:24 a.m., Dr. Suyot transferred Mrs. Daniels to non-critical care.  However, at the same time, Dr. Suyot informed Mrs. Daniels' travel partner that Mrs. Daniels needed a shoreside medical referral.   In fact, at 3:24 am. Dr. Suyot completed a Referral Ashore Form for Mrs. Daniels that noted the need for her to be seen in an emergency room in San Juan, Puerto Rico and of a suspected diagnosis of syncope, collapse, rule out infarct vs.

hemorrhage and rule out a seizure.  Despite this, no efforts were made to disembark Mrs. Daniels from the ship or to contact a shoreside facility or the United States Coast Guard or to contact a shoreside specialist for a telemedicine consult.

41.     At 4:00 a.m., the ship's medical staff noted that Mrs. Daniels was still complaining of a headache.

42.     At 4:10 a.m., Mrs. Daniels was given Ketorolac, which is not indicated when one of the diagnoses is a hemorrhage, as Ketorolac is known to inhibit clotting.

43.     At 6:00 a.m., Mrs. Daniels was noted to have had "another episode of passing out" and she was found to have been cold, clammy and diaphoretic.  Then, at 6:09 a.m. Mrs. Daniels had an elevated blood pressure of 185/88, nausea, headache and feeling as if she was passing out.  Mrs. Daniels' blood pressure remained consistently elevated from 6:09 a.m. until approximately 7:49 a.m. and no medications to control her blood pressure were ever administered.

44.     The NCL Getaway arrived at port in Puerto Rico at approximately 8:30 a.m. on March 3, 2024.  At that time, paramedics boarded the vessel and transferred Mrs. Daniels to Doctor's Center Hospital in San Juan.

45.     At Doctor's Center Hospital in San Juan later on the morning of March 3, 2024, Mrs. Daniels was found to have a ruptured aneurysm.

46.     Mrs. Daniels was transferred from Doctor's Center Hospital in San Juan to Centro Medico de Puerto Rico at 12:16 p.m. on March 3, 2024 for neurosurgical intervention, where she passed away on March 4, 2024.

47.     Despite Mrs. Daniels' life-threatening condition while in the NCL *Getaway's* medical center, Dr. Suyot and the NCL *Getaway* staff failed to timely and properly treat her

and they failed to timely and properly act and disembark her from the *Getaway* and they failed to arrange for and/or conduct a telemedicine consult with a specialist.  Mrs. Daniels spent more than seven (7) hours in the *Getaway's* medical center in this life-threatening condition.

48.     There was no communication or effort between Dr. Suyot and the *Getaway's* medical staff with the *Getaway's* captain about the position, location and speed of the ship nor was there any effort to divert the ship or increase the speed of the ship in order to get Mrs. Daniels to shore sooner.  Furthermore, there was no communication or effort by Dr. Suyot or the *Getaway's* medical staff to medically evacuate Mrs. Daniels from the ship to a shoreside hospital, including but not limited to, contacting the United States Coast Guard.  Similarly, no telemedicine consult was obtained by Dr. Suyot or the *Getaway's* medical staff with a shoreside specialist regarding Mrs. Daniels' presentation and treatment.

49.     Dr. Suyot and the NCL *Getaway's* medical staff negligently dismissed Mrs. Daniels' presentation as being benign and not requiring urgent medical treatment that was not available on the NCL *Getaway* and they failed to ascertain the root cause of her symptoms, properly treat her symptoms and medically disembark her from the ship so that her impending code and aneurysm rupture could be prevented.

50.     The aforementioned acts of negligence and unreasonable delay and failure in disembarking Mrs. Daniels to a higher level of care and the negligent and unreasonable delays in administering proper treatment caused Mrs. Daniels to suffer greatly and directly and proximately led to her death.

51.     NCL's physicians, including Dr. Suyot and the NCL shoreside medical team, were aware of the time-sensitive nature of Mrs. Daniels' consistently abnormal symptoms, including her headache, nausea, diaphoresis, cold sensation, low Glasgow Coma Scale score

and elevated blood pressure.  It was likewise known by NCL that such a condition calls for urgent treatment at a capable facility.

52.     In light of the symptoms and manifestations exhibited by Mrs. Daniels, any reasonably prudent healthcare provider in Dr. Suyot's position and the position of the ship's medical staff would have known that a medical air-evacuation or other expeditious disembarkation to a comprehensive treatment center was medically necessary.

53.     An air-evacuation was both medically necessary and operationally feasible to transport Mrs. Daniels to a higher level of care.

54.     Despite Mrs. Daniels' dire condition which required urgent disembarkation to a higher level of care and knowing that an air evacuation with a helicopter, rendezvous with a rescue vessel, or expeditious diversion of the vessel to a point of debarkation was operationally feasible, NCL failed to analyze or inquire as to possible disembarkation options to assist Mrs. Daniels.  Instead, the decision was made to keep her on the vessel for an excessive and medically unacceptable period of time.  Mrs. Daniels was left without the proper care and treatment that she needed as a result.

55.     NCL's personnel made the decision to continue on its scheduled itinerary without making any effort or arrangements to medically evacuate Mrs. Daniels or get her to a higher level of care capable of treating her for her condition prior to arrival at the pre-planned port of call.  NCL's aim was clear, to avoid operational disruption to the great detriment of their passenger.

56.     The failure to properly evaluate and treat Mrs. Daniels and disembark her to a proper level of care and the corresponding delays caused by NCL prevented her from being emergently evacuated from the *Getaway* and evaluated by specialists who are trained to treat

such patients.

57.     As a direct and proximate result of NCL's negligence, Mrs. Daniels suffered a ruptured aneurysm and died.

## COUNT I
## DIRECT LIABILITY OF NCL FOR NEGLIGENCE UNDER DOHSA

58.     Plaintiff re-alleges and incorporates by reference paragraphs one (1) through fifty-seven (57) of this Amended Complaint as though fully set forth herein.

59.     In light of NCL's experience and familiarity with the demographics of the passengers on its cruises, the onboard and offshore recreational activities taking place on its cruises, the foreign destinations visited on its cruises and the illnesses and emergencies experienced by past cruise passengers, it was reasonably foreseeable to NCL that the *Getaway* would have passengers similar in age to Mrs. Daniels and passengers with illnesses and emergencies such as hers.  Likewise, it was reasonably foreseeable that such passengers would require proper examination, evaluation, treatment and evacuation.

60.     NCL owed the duty to provide prompt and appropriate medical care as regards the symptoms with which Mrs. Daniels presented with to the *Getaway* medical center and of exercising reasonable care under the circumstances.  In particular, as Mrs. Daniels suffered a consistently and significantly elevated blood pressure, headache, diaphoresis, nausea, loss of consciousness, low Glasgow Coma Scale score and difficulties comprehending and/or communicating with medical center staff while in the *Getaway's* medical center, NCL owed Mrs. Daniels the duty of protecting her from injury relating to her emergent condition and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances.

61.     NCL breached its duty of protecting Mrs. Daniels from injury relating to her

emergent condition and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances and breached its duty in one or more of the following ways:

a.  NCL failed to properly treat Mrs. Daniels;

b.  NCL failed to timely treat Mrs. Daniels;

c.  NCL failed to properly diagnose Mrs. Daniels and/or negligently misdiagnosed her;

d.  NCL failed to timely diagnose Mrs. Daniels;

e.  NCL failed to properly assess Mrs. Daniels' condition;

f.  NCL failed to perform and/or arrange for appropriate diagnostic testing given Mrs. Daniels' condition;

g.  NCL failed to obtain consultations with appropriate specialists;

h.  NCL failed to properly monitor Mrs. Daniels;

i.  NCL failed to air-evacuate Mrs. Daniels from the ship so that she could promptly receive treatment;

j.  NCL failed to timely divert the ship so that Mrs. Daniels could promptly receive treatment;

k.  NCL failed to contact the United States Coast Guard regarding the need for an air evacuation;

l.  NCL failed to properly or timely consult qualified shore-based personnel regarding Mrs. Daniels' condition;

m.  NCL failed to obtain a proper medical opinion regarding Mrs. Daniels' condition;

n.  NCL failed to timely and properly utilize "Telemedicine" and other resources on the vessel to properly assess Mrs. Daniels' condition;

o.  NCL failed to develop and institute adequate procedures and policies to address Mrs. Daniels' medical situation;

p.  NCL failed to appreciate the severity of Mrs. Daniels' worsening condition;

q.   NCL failed to perform any procedure to Mrs. Daniels' medical benefit;

r.   NCL failed to properly ascertain sufficient information to determine where Mrs. Daniels should be transferred;

s.   NCL deviated from the standard of care for treating patients in Mrs. Daniels' condition;

t.   NCL failed to administer appropriate medications and/or administer them on a timely basis;

u.   NCL failed to perform a complete physical examination of Mrs. Daniels, including a failure to perform a complete neurologic examination;

v.   NCL failed to create complete entries and proper documentation in Mrs. Daniels' medical chart regarding her condition and the treatment rendered.

62.   NCL knew or reasonably should have known about these conditions and failures but failed to correct them prior to the incident that caused Mrs. Daniels' death. These conditions and failures were longstanding and obvious to NCL.  NCL is aware that passengers may suffer from life threatening conditions such as the one that Mrs. Daniels' presented to and remained in the *Getaway's* medical center with and were aware of the urgent need to evacuate such patients to competent medical centers capable of providing treatment.

63.   As a direct and proximate result of NCL breaching its duty to Mrs. Daniels, she suffered greatly and died.  If Mrs. Daniels had received appropriate care and treatment onboard or been timely evacuated from the ship, she would not have suffered such devastating injuries causing her death.

64.   Mrs. Daniels' survivors have suffered damages as recoverable under DOHSA, including loss of support, loss of services, funeral expenses, loss of inheritance, loss of past and future earnings, loss of nurture and guidance, and all other pecuniary damages recoverable under DOHSA.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment against NCL for all pecuniary damages recoverable under DOHSA, including interest, court costs and all other relief deemed just and proper.

## COUNT II
## NEGLIGENCE OF NCL'S MEDICAL PERSONNEL
### (Vicarious Liability Based Upon Actual Agency / *Respondeat Superior*)

65.     Plaintiff re-alleges and incorporates by reference paragraphs one (1) through fifty-seven (57) of this Amended Complaint as though fully set forth herein.

66.     NCL's medical personnel, including the doctors and nurses on board the *Getaway*, were the employees, agents, servants and/or persons otherwise authorized to act on behalf of NCL.  Thus, NCL is vicariously liable for the acts and/or omissions of its medical personnel.

67.     NCL acknowledged that its medical personnel, including the doctors and nurses onboard the *Getaway*, would act for it, and the medical personnel manifested an acceptance of the undertaking. For example: (1) NCL directly paid the medical personnel for their work in the medical center onboard the *Getaway*; (2) the medical center on board the *Getaway* was created, owned and operated by NCL; (3) the medical personnel on board the *Getaway* worked at what NCL describes in its advertising as NCL's medical center; and (4) NCL knowingly provided, and the medical personnel on board the *Getaway* knowingly wore uniforms bearing NCL's name and logo.

68.     NCL's medical personnel, including the doctors and nurses on board the *Getaway*, were subject to the right of control by NCL, and were acting within the scope of their employment or agency.  For example: (1) the medical personnel were employed by NCL; (2) the medical personnel were hired to work in a medical center on board the *Getaway*

that was created, owned and operated by NCL; (3) the medical personnel were paid salaries and/or other employment related benefits directly by NCL; (4) the medical personnel on board the *Getaway* were considered to be members of the ship's crew; (5) the medical personnel were required to wear uniforms or other insignia furnished by NCL; (6) NCL put the medical personnel on board the *Getaway* under the command of the ship's superior officers, and they were subject to the ship's discipline and the master's orders; (7) NCL had the right to fire its medical personnel; (8) NCL directly billed the Plaintiff and other passengers onboard the *Getaway* for services rendered by its medical personnel and/or use of the onboard medical center, medical equipment and medical supplies; and (9) the medical personnel on board the *Getaway* were subject to the control of NCL's shoreside department.

69.    NCL, through its medical personnel, owed Mrs. Daniels the duty of exercising reasonable care under the circumstances.  In particular, as Mrs. Daniels suffered a consistently and significantly elevated blood pressure, headache, diaphoresis, nausea, loss of consciousness, low Glasgow Coma Scale score and difficulties comprehending and/or communicating with medical center staff while in the *Getaway's* medical center, NCL owed Mrs. Daniels the duty of protecting her from injury relating to her emergent condition, and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances.

70.    NCL, through its medical personnel, breached its duty of protecting Mrs. Daniels from injury relating to her emergent condition, and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances.  NCL, through its medical personnel, breached its duty in one or more of the following ways:

a.  NCL failed to properly treat Mrs. Daniels;

b.  NCL failed to timely treat Mrs. Daniels;

c.  NCL failed to properly diagnose Mrs. Daniels and/or negligently misdiagnosed her;

d.  NCL failed to timely diagnose Mrs. Daniels;

e.  NCL failed to properly assess Mrs. Daniels' condition;

f.  NCL failed to perform and/or arrange for appropriate diagnostic testing given Mrs. Daniels' condition;

g.  NCL failed to obtain consultations with appropriate specialists;

h.  NCL failed to properly monitor Mrs. Daniels;

i.  NCL failed to air-evacuate Mrs. Daniels from the ship so that she could promptly receive treatment;

j.  NCL failed to timely divert the ship so that Mrs. Daniels  could promptly receive treatment;

k.  NCL failed to contact the United States Coast Guard regarding the need for an air evacuation;

l.  NCL failed to properly or timely consult qualified shore-based personnel regarding Mrs. Daniels's condition;

m. NCL failed to obtain a proper medical opinion regarding Mrs. Daniels's condition;

n.  NCL failed to timely and properly utilize "Telemedicine" and other resources on the vessel to properly assess Mrs. Daniels' condition;
o.  NCL failed to develop and institute adequate procedures and policies to address Mrs. Daniels' medical situation;

p.  NCL failed to appreciate the severity of Mrs. Daniels' worsening condition;

q.  NCL failed to perform any procedure to Mrs. Daniels' medical benefit;

r.  NCL failed to properly ascertain sufficient information to determine where Mrs. Daniels should be transferred;

s.  NCL deviated from the standard of care for treating patients in Mrs.

Daniels's condition;

t.   NCL failed to appropriate medications and/or administer them on a timely basis;

u.   NCL failed to perform a complete physical examination of Mrs. Daniels, including a failure to perform a complete neurologic examination;

v.   NCL failed to create complete entries and proper documentation in Mrs. Daniels' medical chart regarding her condition and the treatment rendered.

71.    NCL, through its medical personnel, knew or reasonably should have known about these conditions and failures, but failed to correct them prior to the incident that injured and led to the death of Mrs. Daniels.  These conditions and failures were longstanding and obvious to NCL.

72.    As a direct and proximate result of NCL breaching its duty to Mrs. Daniels, she suffered greatly and died.  If Mrs. Daniels had received appropriate care and treatment onboard or been timely evacuated from the ship, she would not have suffered and died.

73.    Mrs. Daniels' survivors have suffered damages as recoverable under DOHSA, including loss of support, loss of services, funeral expenses, loss of inheritance, loss of past and future earnings, loss of nurture and guidance, and all other pecuniary damages recoverable under DOHSA.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment against NCL for all pecuniary damages recoverable under DOHSA, including interest, court costs and all other relief deemed just and proper.

## COUNT III
## <u>NEGLIGENCE OF NCL'S MEDICAL PERSONNEL</u>
### (Vicarious Liability Based Upon Apparent Agency)

74.    Plaintiff re-alleges and incorporates by reference paragraphs one (1) through fifty-seven (57) of this Amended Complaint as though fully set forth herein.

75.     NCL's medical personnel, including the doctors and nurses on board the *Getaway*, were the apparent employees, agents, servants and/or persons otherwise authorized to act on behalf of NCL.  Thus, NCL is vicariously liable for the acts and/or omissions of its medical personnel.

76.     NCL made representations to Mrs. Daniels and other passengers onboard the *Getaway* that the ship's medical personnel were the employees, agents, servants and/or persons otherwise authorized to act for NCL's benefit. For example: (1) NCL promoted the medical personnel on board the *Getaway* and represented them as being NCL employees through brochures, internet advertising and/or signs, documents, and uniforms on the ship; (2) NCL promoted the medical center on board the *Getaway* and described it in proprietary language; (3) the medical personnel on board the *Getaway* worked in the medical center that NCL promoted and described in proprietary language; (4) NCL directly billed Mrs. Daniels and other passengers onboard the *Getaway* for services rendered by the onboard medical personnel and/or use of the on board medical center, medical equipment and medical supplies; (5) the medical personnel on board the *Getaway* were required to wear uniforms or other insignia furnished by NCL; (6) NCL held out the medical personnel on board the *Getaway* as members of the ship's crew; and (7) the medical personnel on board the *Getaway* spoke and acted as though they were employed by NCL. NCL had knowledge of such representations but never took any action to indicate otherwise.

77.     NCL's representations to Mrs. Daniels onboard the *Getaway* caused her to reasonably believe that the ship's medical personnel were the employees, agents, servants and/or persons otherwise authorized to act for NCL's benefit.  Indeed, NCL actually intended that Mrs. Daniels have such perception or belief because it is a marketing tool to

induce passengers such as Mrs. Daniels to purchase cruises on NCL ships in the first place, to feel secure while on board NCL s' ships and/or to be a repeat customer.

78.     NCLs' representations to Mrs. Daniels induced her detrimental, justifiable reliance upon the appearance of agency. For example, Mrs. Daniels justifiably relied upon NCL's representations in deciding to purchase a cruise on the *Getaway* and seek care in its medical center and but for those representations, would not have gone on the *Getaway* and/or have sought care elsewhere.

79.     NCL, through its medical personnel, owed Mrs. Daniels the duty of exercising reasonable care under the circumstances.  In particular, as Mrs. Daniels suffered a consistently and significantly elevated blood pressure, headache, diaphoresis, nausea, loss of consciousness, low Glasgow Coma Scale score and difficulties comprehending and/or communicating with medical center staff while in the *Getaway's* medical center, NCL owed Mrs. Daniels the duty of protecting her from injury relating to her emergent condition and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances.

80.     NCL, through its medical personnel, breached its duty of protecting Mrs. Daniels from injury relating to her emergent condition, and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances. NCL, through its medical personnel, breached its duty in one or more of the following ways:

a.     NCL failed to properly treat Mrs. Daniels;

b.     NCL failed to timely treat Mrs. Daniels;

c.     NCL failed to properly diagnose Mrs. Daniels and/or negligently misdiagnosed her;

d.    NCL failed to timely diagnose Mrs. Daniels;

e.    NCL failed to properly assess Mrs. Daniels' condition;

f.    NCL failed to perform and/or arrange for appropriate diagnostic testing given Mrs. Daniels's condition;

g.    NCL failed to obtain consultations with appropriate specialists;

h.    NCL failed to properly monitor Mrs. Daniels;

i.    NCL failed to air-evacuate Mrs. Daniels from the ship so that he could promptly receive treatment;

j.    NCL failed to timely divert the ship so that Mrs. Daniels  could promptly receive treatment;

k.    NCL failed to contact the United States Coast Guard regarding the need for an air evacuation;

l.    NCL failed to properly or timely consult qualified shore-based personnel regarding Mrs. Daniels' condition;

m.    NCL failed to obtain a proper medical opinion regarding Mrs. Daniels' condition;

n.    NCL failed to timely and properly utilize "Telemedicine" and other resources on the vessel to properly assess Mr. Daniels's condition;

o.    NCL failed to develop and institute adequate procedures and policies to address Mrs. Daniels' medical situation;

p.    NCL failed to appreciate the severity of Mrs. Daniels' worsening condition;

q.    NCL failed to perform any procedure to Mrs. Daniels' medical benefit;

r.    NCL failed to properly ascertain sufficient information to determine where Mrs. Daniels should be transferred;

s.    NCL deviated from the standard of care for treating patients in Mrs. Daniels' condition;

t.    NCL failed to administer appropriate medications and/or administer them on a timely basis;

u.    NCL failed to perform a complete physical examination of Mrs. Daniels,

including a failure to perform a complete neurologic examination;

> v.   NCL failed to create complete entries and proper documentation in Mrs. Daniels' medical chart regarding her condition and the treatment rendered.

81.     NCL, through its medical personnel, knew or reasonably should have known about these conditions and failures, but failed to correct them prior to the incident that injured and led to the death of Mrs. Daniels. These conditions and failures were longstanding and obvious to NCL.

82.     As a direct and proximate result of NCL breaching its duty to Mrs. Daniels, she suffered greatly and died.  If Mrs. Daniels had received appropriate care and treatment onboard or been timely evacuated from the ship, she would not have suffered such devastating injuries and died.

83.     Mrs. Daniels' survivors have suffered damages as recoverable under DOHSA, including loss of support, loss of services, funeral expenses, loss of inheritance, loss of past and future earnings, loss of nurture and guidance, and all other pecuniary damages recoverable under DOHSA.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment against NCL for all pecuniary damages recoverable under DOHSA, including interest, court costs and all other relief deemed just and proper.

## COUNT IV
## NEGLIGENCE OF NCL THROUGH ITS NON-MEDICAL PERSONNEL
### (Vicarious Liability Based Upon Actual Agency / *Respondeat Superior*)

84.     Plaintiff re-alleges and incorporates by reference paragraphs one (1) through fifty-seven (57) of this Amended Complaint as though fully set forth herein, except such paragraphs that may conflict with or are at odds with any paragraphs within this Count of

Plaintiff's Amended Complaint.

85.    NCL's non-medical personnel, which consisted of the *Getaway's* Captain/Master, the *Getaway's* assistant beverage manager who contacted the *Getaway's* medical personnel on March 3, 2024 regarding Mrs. Daniels, staff member Irish Tampus, staff member Bryan whose name appears on the Onboard Charge Receipt No. 3099246, NCL's chief medical officer who was working at the time that Mrs. Daniels was under the care of the *Getaway's* medical personnel and NCL's shoreside medical team members who were working at the time that Mrs. Daniels was under the care of the *Getaway's* medical personnel on March 3, 2024 (hereafter "NCL's non-medical personnel), were the employees, agents, servants and/or persons otherwise authorized to act on behalf of NCL. [1] Thus, NCL is vicariously liable for the acts and/or omissions of its non-medical personnel.

86.    NCL acknowledged that its non-medical personnel, would act for it, and the non-medical personnel manifested an acceptance of the undertaking.  For example: (1) NCL directly paid the non-medical personnel for their work related to or in conjunction with passengers in the medical center onboard the *Getaway*; (2) the medical center on board the *Getaway* was created, owned and operated by NCL; (3) the non-medical personnel on board the *Getaway* and shoreside worked at what NCL describes in its advertising as NCL's medical center and shoreside operations; and (4) NCL knowingly provided, and the non-medical personnel on board the *Getaway* and on NCL's shoreside staff knowingly wore uniforms bearing NCL's name and logo.

87.    NCL's non-medical personnel were subject to the right of control by NCL, and

---

[1] As no discovery has taken place in this action and Plaintiff may discover the identities and job titles of additional non-medical personnel as the action progresses, Plaintiff reserves the right to name and identify additional NCL non-medical personnel as discovery progresses.

were acting within the scope of their employment or agency.  For example: (1) the non-medical personnel were employed by NCL; (2) the non-medical personnel were hired to work in a medical center on board the *Getaway* that was created, owned and operated by NCL or at NCL's shoreside office, owned and operated by NCL; (3) the non-medical personnel were paid salaries and/or other employment related benefits directly by NCL; (4) the non-medical personnel on board the *Getaway* were considered to be members of the ship's crew and the shoreside staff were considered to be members of NCL's shoreside staff or operations; (5) the non-medical personnel were required to wear uniforms or other insignia furnished by NCL; (6) NCL put the non-medical personnel on board the *Getaway* under the command of the ship's superior officers, and they were subject to the ship's discipline and the master's orders; (7) NCL had the right to fire its non-medical personnel; (8) NCL directly billed Mrs. Daniels and other passengers onboard the *Getaway* for services rendered by its non-medical personnel; and (9) the non-medical personnel on board the *Getaway* and at NCL's shoreside offices were subject to the control of NCL's shoreside department.

88.    In light of NCL's experience and familiarity with the demographics of the passengers on its cruises, the onboard and offshore recreational activities taking place on its cruises, the foreign destinations visited on its cruises, and the illnesses and emergencies experienced by past cruise passengers, it was reasonably foreseeable to NCL that the *Getaway* would have passengers similar in age to Mrs. Daniels, and passengers with illnesses and emergencies such as her condition. Likewise, it was reasonably foreseeable that such passengers would require proper medical logistical support and medical evacuation.

89.    NCL, through its non-medical personnel, including its officers, directors, employees, agents, servants and/or persons otherwise authorized to act on behalf of NCL,

both on board the *Getaway* and located at NCL's shore-side offices, owed the duty of exercising reasonable care under the circumstances. In particular, as Mrs. Daniels suffered a consistently and significantly elevated blood pressure, headache, diaphoresis, nausea, loss of consciousness, low Glasgow Coma Scale score and difficulties comprehending and/or communicating with medical center staff while in the *Getaway's* medical center, NCL owed the duty of protecting her from injury relating to her emergent condition, and of exercising reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances.

90.     NCL, through the negligence of its non-medical personnel, breached its duty to exercise reasonable care to furnish such aid and assistance as ordinarily prudent persons would render under similar circumstances. NCL breached its duty in one or more of the following ways:

   a.   NCL failed to timely and properly communicate the condition of Mrs. Daniels to its shoreside personnel;

   b.   NCL failed to follow proper policies and procedures to ascertain the operational feasibility of a medical evacuation for Mrs. Daniels;

   c.   NCL failed to air-evacuate Mrs. Daniels from the ship so that she could promptly receive treatment;

   d.   NCL failed to timely divert the ship so that Mrs. Daniels could promptly receive treatment;

   e.   NCL failed to evacuate Mrs. Daniels by speed boat, tender boat, or transfer;

   f.   NCL failed to contact the United States Coast Guard regarding the need for an air evacuation;

   g.   NCL refused to alter its itinerary to transport Mrs. Daniels, electing to avoid operational disruption over the needs of its critically ill guest.

91.     NCL, through its non-medical personnel, knew or reasonably should have

known about these conditions and failures, but failed to correct them prior to the incident that caused the death of Mrs. Daniels. These conditions and failures were longstanding and obvious to NCL.

92.    As a direct and proximate result of NCL breaching its duty to Mrs. Daniels, she suffered greatly and died.  If Mrs. Daniels had received appropriate care and treatment onboard or been timely evacuated from the ship, she would not have suffered such devastating injuries and died.

93.    Mrs. Daniels' survivors have suffered damages as recoverable under DOHSA, including loss of support, loss of services, funeral expenses, loss of inheritance, loss of past and future earnings, loss of nurture and guidance, and all other pecuniary damages recoverable under DOHSA.

WHEREFORE, Plaintiff, respectfully requests that this Court enter judgment against NCL for all pecuniary damages recoverable under DOHSA, including interest, court costs and all other relief deemed just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims set forth herein.

Dated this 1st day of April, 2025.

Respectfully submitted,

By:  /s/ Carlos Fabano
**Carlos A. Fabano** (FBN 0013107)
LEESFIELD & PARTNERS, P.A.
2350 South Dixie Highway
Miami, Florida 33133
Telephone: 305-854-4900
Facsimile:  305-854-8266
fabano@leesdfield.com
abreu@leesfield.com